**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| NICHOLAS PARKER, on behalf of himself and others similarly situated, | ) ) | CASE NO. 1:17-cv-05353-GBD-HBP |
| | ) | JUDGE GEORGE B. DANIELS |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| UNITED INDUSTRIES CORPORATION, | ) ) | |
| Defendant. | ) ) | |

---

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVE, AND APPOINTMENT OF CLASS COUNSEL**

---

Dated: April 15, 2019

Ronie M. Schmelz
TUCKER ELLIS LLP
515 South Flower Street
Forty Second Floor
Los Angeles, CA 90071
Tel.:  213.430.3400
Fax:  213.430.3409
E-mail:      ronie.schmelz@tuckerellis.com

Michael J. Ruttinger (pro hac vice)
TUCKER ELLIS LLP
950 Main Avenue
Suite 1100
Cleveland, OH 44113-7213
Tel:  216.592.5000
Fax: 216.592.5009
Email:      michael.ruttinger@tuckerellis.com

*Attorney for Defendant United Industries Corporation*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES ............................................................................................... iii

I.   INTRODUCTION ...................................................................................................... 1

II.  FACTUAL AND PROCEDURAL BACKGROUND .......................................................... 3

      A.    UIC developed Cutter Natural Insect Repellent to meet consumer demand for a DEET-free personal mosquito repellent. ................................... 3

      B.    Cutter Natural Insect Repellent is a "Section 25(b)" product proven to repel mosquitoes by independent, third-party laboratory testing and successfully registered in those States requiring efficacy testing. ......................................................................................... 5

      C.    Plaintiff's made-for-litigation contra-efficacy studies demonstrate variability and the impropriety of class certification, not Cutter Natural's inefficacy ............................................................................................. 8

      D.    Plaintiff Nicholas Parker purchased Cutter Natural Insect Repellent and used it for mosquito protection at Camp No Counselors. .......................................................................................... 12

III. LAW AND ARGUMENT ........................................................................................... 14

      A.    Class Certification Standards ........................................................................ 14

      B.    Plaintiff cannot establish the Rule 23(a) prerequisites for class certification. .................................................................................................... 15

            1.    Plaintiff cannot establish that his claims are typical of the proposed class he seeks to represent. ................................................. 16

            2.    Plaintiff cannot adequately represent a class seeking injunctive relief because he lacks standing to seek injunctive relief on his own behalf. .................................................. 18

      C.    Plaintiff cannot satisfy the requirements of Rule 23(b)(3) because individual issues will predominate over issues common to the class ................................................................................................................ 19

            1.    Individual issues will predominate on the question of whether Cutter Natural Insect Repellent is "effective" for members of the class. ....................................................................... 19

2.      Individual issues will predominate on the question of whether class members were deceived. ............................................ 20

3.      Plaintiff cannot prove through common evidence that all class members received a "worthless" product.................................. 21

D.     Certification of a Rule 23(b)(2) injunctive relief class is inappropriate in light of Plaintiff's lack of standing to pursue injunctive relief individually........................................................................ 23

E.     If this Court certifies a class, it should be restricted to consumers who purchased Cutter Natural Insect Repellent in the State of New York......................................................................................................... 23

IV. CONCLUSION.......................................................................................................... 25

CERTIFICATE OF SERVICE ..................................................................................... 27

# TABLE OF AUTHORITIES

## Cases

*Amchem Prods., Inc. v. Windsor*
   521 U.S. 591 (1997) ................................................................................. 14, 15, 19

*Amgen, Inc. v. Conn. Retirement Plans & Trust Funds*
   133 S. Ct. 1184 (2013) ................................................................................ 15

*Bridge v. Phoenix Bond & Indemn. Co.*
   553 U.S. 639 (2008) .................................................................................... 21

*Bristol-Myers Squibb Co. v. Superior Court of California*
   137 S. Ct. 1773 (2017) .......................................................................... 2, 23, 24

*Comcast Corp. v. Behrend*
   569 U.S. 27 (2013) ................................................................................ passim

*Ebin v. Kangadis Food Inc*
   297 F.R.D. 561 (S.D.N.Y. 2014) ................................................................ 18

*General Telephone Co. of Southwest v. Falcon*
   457 U.S. 147 (1982) .................................................................................... 15

*Goldemberg v. Johnson & Johnson Consumer Co., Inc*
   8 F. Supp. 3d 467 (S.D.N.Y. 2014) ........................................................... 21

*Hart v. BHH*
   No. 15cv4804, 2017 WL 2912519 (S.D.N.Y. July 6, 2017) ..................... 18

*In re Dental Supplies Antitrust Litig.*
   No. 16 Civ. 696 (BMC)(GRB), 2017 WL 4217115, (E.D.N.Y. Sept. 20, 2017) ............... 2, 25

*In re Flag Telecom Holdings, Ltd. Securities Litig.*
   574 F.3d 29 (2d Cir. 2009) ......................................................................... 17

*In re Grand Theft Auto Video Game Consumer Litig.*
   251 F.R.D. 139 (S.D.N.Y. 2008) ............................................................... 26

*In re POM Wonderful LLC*
   No. ML 10-02199 DDP RZX, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ........................ 24

*Jackson v. Bank of America, N.A.*
   No. 16-CV-787G, 2018 WL 2381888 (W.D.N.Y. May 25, 2018) ........................... 26

*Johnson v. Nextel Communications Inc.*
  780 F.3d 128 (2d Cir. 2015) ........................................................................................ 26

*King Cty. v. IKB Deutsche Industriebank AG*
  769 F. Supp. 2d 309 (S.D.N.Y. 2011) ......................................................................... 24

*Mazzei v. Money Store*
  829 F.3d 260 (2d Cir. 2016) ........................................................................................ 17

*McDonnell v. Nature's Way Prods., LLC*
  No. 16 C 5011, 2017 WL 4864910 (N.D. Ill. Oct. 26, 2017) ...................................... 24

*McLaughlin v. Am. Tobacco Co.*
  522 F.3d 215 (2d Cir. 2008) .................................................................................. 22, 25

*Myers v. Hertz Corp.*
  624 F.3d 537 (2d Cir. 2010 ......................................................................................... 14

*Newman v. RCN Telecom Servs., Inc.*
  238 F.R.D. 57 (S.D.N.Y. 2006) ................................................................................... 20

*O'Shea v. Littleton*
  414 U.S. 488 (1974) ..................................................................................................... 19

*Pagan v. Abbott Laboratories*
  287 F.R.D. 139 (E.D.N.Y. 2012) ................................................................................. 18

*Pelman v. McDonald's Corp.*
  272 F.R.D. 82 (S.D.N.Y. 2010) ................................................................................... 20

*Rodriguez v. It's Just Lunch, Intern.*
  300 F.R.D. 125 (S.D.N.Y. 2014) ................................................................................. 14

*Shain v. Ellison*
  356 F.3d 211 (2d Cir. 2004) ........................................................................................ 19

*Spokeo, Inc. v. Robins*
  136 S. Ct. 1540 (2016) ................................................................................................. 19

*Sykes v. Mel S. Harris and Associates, LLC*
  780 F.3d 70 (2d Cir. 2015) .......................................................................................... 14

*Tomasino v. Estee Lauder Co., Inc.*
  44 F. Supp. 3d 251 (E.D.N.Y. 2015) ........................................................................... 19

*Vaccariello v. XM Satellite Radio, Inc.*
  295 F.R.D. 62 (S.D.N.Y. 2013) .............................................................................. 18, 20

*Waggoner v. Barclays PLC*
   875 F.3d 79 (2d Cir. 2017) ........................................................................... 2, 23, 24

*Wal-Mart Stores, Inc. v. Dukes*
   564 U.S. 338 (2011)........................................................................ passim

*Wenokur v. AXA Equitable Life Ins. Co.*
   No. CV-17-00165-PHX-DLR, 2017 WL 4357916 (D. Ariz. Oct. 2, 2017) ........................... 26

## Statutes

40 C.F.R. § 152.25(f) ........................................................................... 6

40 C.F.R. 152.25(f)(3)(ii) ........................................................................ 5

7 U.S.C. § 136........................................................................ 5

New York G.B.L. § 349 ........................................................................ passim

## Other Authorities

Nagareda, *Class Certification in the Age of Aggregate Proof*,
   84 N.Y.U. L. Rev. 97 (2009) ........................................................................ 14

## I.   __INTRODUCTION__

The thrust of Plaintiff Nicholas Parker's lawsuit is that Cutter Natural Insect Repellent ("Cutter Natural") "is a complete sham," "ineffective and worthless" (Compl., Doc. 1, ¶ 3), and consequently he—and all consumers who purchased it—should receive a full refund.  Plaintiff further maintains that Defendant United Industries Corporation ("UIC") should be penalized by having to answer to a nationwide class, or at least several sub-classes,[1] for its allegedly fraudulent conduct and for purportedly violating a variety of consumer protection laws.  As discussed below, Plaintiff cannot establish either the Rule 23(a) or (b) prerequisites for certifying a class.

The first, most fundamental, problem with Plaintiff's attempt to certify a nationwide class is that Plaintiff's central allegations are so individualized that they cannot be proven on a classwide basis. At the heart of Plaintiff's case is an issue to which many consumers can relate—experiencing a mosquito bite despite using mosquito repellent. Just because a consumer gets bitten by a mosquito does not mean the repellent is a "sham" or "worthless." Consumer experiences with personal mosquito repellents vary, just as testing done on those same repellents in a laboratory vary. Variability is an inherent, unavoidable trait of mosquito repellent performance, and it renders Plaintiff's "worthlessness" allegation impossible to prove across the class.

The second problem is that Plaintiff's definition of "worthlessness" excludes aspects of Cutter Natural that many consumers value, and he is therefore atypical of his proposed class. He cannot prove that his experience is typical of, or that he could adequately represent, a class of all Cutter Natural consumers. Many consumers value Cutter Natural as an option for a personal

---

[1] In addition to his nationwide fraud class allegations, Plaintiff alleges that this Court should certify three sub-classes, including a "Multistate Breach of Express Warranty" sub-class, a "New York GBL" sub-class, and a "New York Unjust Enrichment" sub-class. (Doc. 49 at 1-2.) Defendant's Opposition addresses the nationwide class allegations, but the arguments as to why that class fails apply with equal force to each of the sub-classes.

mosquito repellent that does not contain the chemical DEET. Indeed, Cutter Natural was developed to meet consumer demand for a DEET-free personal mosquito repellent. Consumers who purchase a DEET-free product understand it may not protect them from mosquitoes for as long as a repellent containing DEET, but are willing to make that trade-off for several reasons, including the desire for a product free from more potent chemicals. It follows that consumers whose purchases are motivated by these different concerns value Cutter Natural differently than consumers who do not have concerns about DEET products. These variations in purchase drivers and expectations of efficacy showcase why Plaintiff's allegation that Cutter Natural is "ineffective and worthless" cannot be adjudicated on a classwide basis.

The third problem is that Plaintiff's proposed classes are geographically overbroad and run afoul of the Due Process Clause of the United States Constitution. This Court cannot exercise personal jurisdiction over the claims of class members who purchased Cutter Natural outside of New York. *In re Dental Supplies Antitrust Litig.*, No. 16 Civ. 696 (BMC)(GRB), 2017 WL 4217115, *9 (E.D.N.Y. Sept. 20, 2017) (citing *Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773 (2017)). Even if it could, Plaintiff has failed in his burden of showing that common evidence can prove the claims of a national or multi-state class in light of variations among individual state laws.

Finally, even if Plaintiff's allegations could survive the "rigorous analysis" required by *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011), the class falls apart under the burden that he offer a damages model that "must actually measure damages that result from the class's asserted theory of injury." *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017). Accordingly, this Court should deny Plaintiff's request to certify a nationwide class, as well as any subclasses, of Cutter Natural consumers.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

This lawsuit is, and has always been, about Plaintiff's claim that Cutter Natural does not repel mosquitoes. The Complaint is replete with allegations that Cutter Natural is "a complete sham," "not an effective insect repellent," and "ineffective and worthless." (*See, e.g.*, Compl. ¶¶ 3, 6, 45, 50; *see also* Doc. 49 at 1.) To support this proposition, Plaintiff relies on a report from his putative expert, Dr. Scott W. Gordon, who opines that "Cutter Natural has no value as a mosquito repellent." (Declaration of Dr. Scott Gordon ("Gordon Decl.") Doc. 47, ¶ 2.) Put simply, the theory of Plaintiff's case is that all consumers were damaged equally because they purchased a no-value product, no matter why they purchased it, where they used it, or regardless of whether the product worked for them. The facts do not support Plaintiff's case.

### A.   UIC developed Cutter Natural Insect Repellent to meet consumer demand for a DEET-free personal mosquito repellent.

Cutter Natural is specifically formulated for and marketed to consumers who seek a DEET-free alternative to mosquito repellency. To supplement its line of DEET-repellent products, UIC began developing Cutter Natural to meet consumer desire "for DEET alternatives and different chemicals than what a typical repellent might contain." (Deposition of Stephen Schwallie ("Schwallie Dep.") 17:22-24, excerpts attached as Exhibit A to the Declaration of Michael J. Ruttinger ("Ruttinger Decl.") filed concurrently herewith.) As Mr. Schwallie explained, "for any consumer, there's interest in learning about new chemicals that might have similar results . . . without the negatives" associated with DEET. (*Id.* 17:25-18:8.)

Although DEET is used extensively around the world and is broadly recognized as having a good safety record, some studies have attracted public attention to DEET-related concerns, which in turn have increased interest in DEET-free products. (March 21, 2019 Declaration of William Donahue ("Donahue Decl.") ¶ 27, attached as Exhibit B to Ruttinger Decl.) As the market for alternative products grew, UIC became convinced of consumer demand for DEET-free mosquito

3

repellent. (Schwallie Dep. 18:20-19:4; Donahue Decl. ¶ 29.) ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████ (Rebuttal Declaration of Dr. Denise N. Martin, Ph.D. ("Martin Rebuttal") ¶¶ 19(a)-

(b), attached as Exhibit C to Ruttinger Decl.)

The research and development process that culminated in Cutter Natural began in 2009

with a prototype based on geraniol, an ingredient known to exhibit repellency against mosquitoes.

(Declaration of Kathleen Cearnal ("Cearnal Decl.") ¶ 4, attached as Exhibit D to Ruttinger Decl.)

In January 2010, UIC tested a variety of DEET-free formulations, including one containing 5%

geraniol (*id.* ¶ 6); in March 2010, it tested a formulation containing 8% geraniol (*id.* ¶ 7). UIC's

testing was never intended to establish efficacy for Cutter Natural, but was instead used to screen

potential formulas that, if viable, would be submitted to a third-party for independent testing to

determine whether the formula was effective at repelling mosquitoes. (*Id.* ¶ 8; *see also* Deposition

of Travis Wood ("Wood Dep.") 29:18-25, excerpts attached as Exhibit E to Ruttinger Decl.) UIC

settled on a formula that included 5% geraniol and 2% soybean oil. (Cearnal Decl. ¶ 9.) Following

peer-reviewed, independent, efficacy testing, UIC began marketing Cutter Natural as a pump-

spray in July 2010. (Deposition of Kathleen Cearnal ("Cearnal Dep.") 90:18-20, excerpts attached

as Exhibit F to Ruttinger Decl.) In December 2012, UIC launched an aerosol version ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

Plaintiff alleges UIC "profited from the 'Zika scare' by selling consumers a product without any reliable basis whatsoever that the product actually worked against the very mosquitoes that carry Zika." (Doc. 49 at 9.) But UIC launched Cutter Natural in June 2010, well before the Zika virus become a well-documented public health concern following outbreaks in Brazil in 2015.[2] Cutter Natural labels do not mention Zika or make claims about disease prevention, and UIC never marketed the product as effective at repelling the species of mosquitoes known to carry Zika. (Rebuttal Declaration of William Donahue ("Donahue Rebuttal") ¶ 11, attached as Exhibit G to Ruttinger Decl.) Indeed, UIC could not have made such representations even if it wanted to do so. Cutter Natural is marketed as a "Section 25(b) Product" under federal law, which prohibits UIC from making any claims about the product's ability "to control insects or rodents carrying specific diseases." 40 C.F.R. 152.25(f)(3)(ii). It is undisputed, moreover, that the copy on Cutter Natural labels did not change after the product's launch in June 2010, demonstrating that UIC took no action to market the product differently to consumers once awareness of the Zika virus increased. (*See* Schwallie Dep. 30:4-17.)

> **B.    Cutter Natural Insect Repellent is a "Section 25(b)" product proven to repel mosquitoes by independent, third-party laboratory testing and successfully registered in those States requiring efficacy testing.**

The federal and state regulatory frameworks that governs the marketing and sale of products like Cutter Natural exists to ensure such products are safe and effective. The facts demonstrate that Cutter Natural met all applicable legal standards.

---

[2] *See, e.g.*, Centers for Disease Control and Prevention, "Possible Association Between Zika Virus Infection and Microcephaly – Brazil 2015," https://www.cdc.gov/mmwr/volumes/65/wr/mm6503e2.htm (last visited April 9, 2019).

Pesticide products, including personal mosquito repellents like Cutter Natural, are regulated by the federal government under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136, *et seq.* (Donahue Decl. ¶ 22.) For many pesticides, the U.S. Environmental Protection Agency ("EPA"), the federal agency that oversees compliance with FIFRA, provides guidelines for the types of tests manufacturers should use to test pesticide efficacy and requires manufacturers to submit data before they can market a pesticide. (*See* Donahue Decl. ¶¶ 22-24.) There is, however, an exception to such testing and data requirements for certain pesticides that are characterized as "Minimum Risk Pesticides" (*id.* ¶ 23; ███████ ████████████████ ; the EPA exempts Minimum Risk Pesticides from registration under FIFRA as long as the active and inert ingredients used in the product are among those listed at 40 C.F.R. § 152.25(f) (the so-called "Rule 25(b) list"). If an ingredient is on the Rule 25(b) list, then the EPA considers the ingredient to be adequately regulated and generally recognized as safe. (Donahue Decl. ¶ 23.) Geraniol and soybean oil are on the 25(b) list (as are the inert ingredients in Cutter Natural), and so Cutter Natural is considered a Minimum Risk Pesticide, adequately regulated and generally recognized as safe under FIFRA. (*See* Cearnal Dep. 50:24-51:1; Donahue Decl. ¶ 22.)

The fact that Minimum Risk Pesticide products like Cutter Natural are exempt from registration under FIFRA does not mean, however, that they are unregulated. Over 40 states currently require registration of Minimum Risk Pesticides, and seven states and the District of Columbia currently require companies to submit efficacy data with their product registrations. (Donahue Decl. ¶ 25; Cearnal Decl. ¶ 13.) █████████████████████ ████████████████████████████████████ ████████████████████████ UIC's registration was approved in every state, including those requiring efficacy data. (Cearnal Decl. ¶ 13.)

6

To support registration in those states that require efficacy data, UIC commissioned two sets of efficacy testing from an independent company, ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████ Dr. Donahue also agreed with the conclusions drawn by the principal researcher in charge of the Bio Research studies, Ron Cardoza, that "Cutter Natural insect repellents do in fact repel mosquitoes." (*Id.* ¶ 41.)

In short, the multiple data sets produced by Bio Research show that Cutter Natural *does in fact repel mosquitoes* and thus is not "worthless" —quite contrary to the position taken by Plaintiff's putative expert, Dr. Gordon. ████████████████████████████████

Dr. Gordon's chief criticism of the Bio Research efficacy tests is that they do not comply with the protocols required for *non*-25(b) pesticides, *i.e.*, protocols designed for DEET repellents that are not at issue in this case. Specifically, Dr. Gordon faults the Bio Research studies for failing to comply with protocols developed by the EPA and World Health Organization ("WHO"). Yet, neither set of protocols applies to 25(b) products. (*Id.* ¶¶ 12, 17.) UIC did not seek FIFRA registration, and the completed efficacy testing comported with the requirements in those states that required its submission. Nor did UIC make claims regarding disease-carrying insects that

---

[3] UIC also commissioned a third study to test the efficacy of a different personal insect repellent, in which Cutter Natural was used as a control subject. UIC did not rely on this third study to substantiate the efficacy of Cutter Natural. (Cearnal Decl. ¶ 11.)

would have made the WHO protocols relevant. (*Id.* ¶ 11.) In short, Dr. Gordon's criticism of Bio Research's methods does not apply to testing for products like Cutter Natural.

Dr. Gordon's other criticisms also miss the mark. 

In summary, UIC commissioned all of the testing required for 25(b) mosquito repellents and justifiably relied on peer-reviewed scientific studies to support its claim that Cutter Natural "repels mosquitoes." UIC further complied with all regulatory requirements to market Cutter Natural in the states that require product registration, including submitting efficacy data when required. These facts contradict Plaintiff's claim that Cutter Natural is "ineffective and worthless."

### C. Plaintiff's made-for-litigation contra-efficacy studies demonstrate variability and the impropriety of class certification, not Cutter Natural's inefficacy.

In tacit acknowledgment that UIC was not required to follow the EPA and WHO testing protocols, Plaintiff endeavors to discredit the Bio Research results by relying on Dr. Gordon's assessment of four different studies and Plaintiff's own anecdotal experience with the product. None of these establish that Cutter Natural is "completely worthless."

The first two studies on which Dr. Gordon relies are made-for-litigation tests performed by Biogents and i2L laboratories, neither of which comply with the EPA and WHO standards that he seeks to impose on Bio Research. (Donahue Rebuttal ¶ 12.) Serious methodological flaws undermine the reliability of both studies, including variations in the age and number of mosquitoes, cage sizes, number of test subjects, and the amount of test material applied to subjects. (*Id.* ¶¶ 13-15.) But even taken at face value, these tests do not substantiate Plaintiff's allegations.

Neither the Biogents study nor the i2L study demonstrates that Cutter Natural is ineffective. Variability is an immutable characteristic of all laboratory testing of personal mosquito repellents. (*Id.* ¶ 8; Donahue Decl. ¶ 37.) It is common to see wide variations in protection times. Laboratory testing for mosquito repellent efficacy "can vary significantly depending on the particular pest species tested, age of the pest species, host or blood source, environmental conditions, formulation type, time of evaluation, and experimental variation within the test system." (Donahue Decl. ¶ 30.) This natural variability means that two different tests, both reliably conducted, can reach significantly different conclusions about protection times. (*Id.*) Thus, while the Biogents and i2L tests on which Dr. Gordon relies purport to show little to no repellency, those limited tests do not establish that Cutter Natural is always ineffective at repelling mosquitoes. (Donahue Rebuttal ¶ 2 ("[N]othing set forth in the Declaration of Scott Gordon . . . changes my expert opinion that Cutter Natural is effective in providing bite protection/repellency against mosquitoes. I continue to hold these opinions to a reasonable degree of scientific certainty.").) Indeed, as Dr. Donahue notes in his Rebuttal Declaration, the Biogents testing also appears to show substantially lower protection times for the 30% DEET product he tested when compared to the labeling claims for that same product—a fact that further underscores the situational variability in *all* testing of personal mosquito repellents.

This variability also applies to consumer experiences. It is common knowledge that some people, more than others, attract mosquitoes and are prone to bites. This natural variance is called "host susceptibility"; "many people report rarely, if ever, being bitten by mosquitoes, while others are highly attractive." (Donahue Decl. ¶ 21.) "[S]ome people experience complete protection times (CPT) of less than an hour," while others using "the same formulation and tested in the same environment demonstrate CPT of 12-hours or greater." (*Id.*) As Ms. Cearnal testified, █████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████ Susceptibility to bites █████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████ ███████████ For

example, a person engaged in outdoor exercise (like hiking at a camp) may emit more carbon

dioxide from breathing hard or lactic acid from sweating, either of which increases the person's

attractiveness to mosquitoes. (*See* Donahue Decl. ¶ 17.) These host- and environment-specific

differences mean that ████████████████████████████████████████

████████████████████████████

The inherent variability in personal mosquito repellent efficacy renders individual

consumers' experiences with Cutter Natural the best evidence of efficacy. █████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

Accordingly, while Plaintiff and others may have found Cutter Natural ineffective for them, there

is considerable evidence that other consumers have had the opposite experience.

For example, attached as Exhibit H to the Ruttinger Declaration are declarations from two

consumers who purchased Cutter Natural for a variety of reasons, used it, and attest that the product

*was* effective.[4] These positive consumer reactions mirror UIC's observations of consumer

satisfaction with the product. Stephen Schwallie, the Division Vice President of Home and Garden

Marketing who oversees marketing of UIC's home and garden brands, testified that UIC ██████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

---

[4] ██████████████████████████████████████████████████████████
████████████████████████████████████



Evidence of product reviews further confirms that Cutter Natural works for many consumers and underscores that consumers' experiences with the product varies. Defendant's expert, Dr. Denise Martin, ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

The last two documents on which Dr. Gordon relies are an article in the Consumer Reports magazine and a journal article from New Mexico State University. Neither supports Dr. Gordon's opinion about the efficacy of Cutter Natural. First, it is impossible to draw scientific conclusions from the Consumer Reports article because we know nothing about the testing methodology, sample size, and other conditions used to arrive at the conclusions in the article. (Donahue Rebuttal ¶ 21.) The parties attempted to subpoena documents and information from the publisher of Consumer Reports, Consumers Union, but the company refused to comply with either subpoena, leaving the article without probative value. (*See* Ruttinger Decl. ¶ 10 and Exhibit I.) Even if the underlying study were revealed and deemed scientifically sound, it still would not support

---

5 ██████████████████████████████████████████████████████████
███████████████████████████████████████████

Plaintiff's claim that the product is worthless since the article reports that Cutter Natural *does* show some efficacy against mosquitoes. (*See* Exhibit 15 to Decl. of Yitzchak Kopel, Doc. 48.)

The New Mexico State University study using a Y-tube olfactometer also fails to support Dr. Gordon's opinion. As Dr. Donahue explains, Y-tube olfactometers like the one used in the University study are designed to evaluate spatial (vapor) characteristics of repellents or study insect behavior, not to assess the efficacy of a repellent. (Donahue Rebuttal ¶ 16.)

### D.   Plaintiff Nicholas Parker purchased Cutter Natural Insect Repellent and used it for mosquito protection at Camp No Counselors.

Plaintiff's experience with Cutter Natural exemplifies the host- and environment-specific variables discussed above. Plaintiff, a college friend and roommate of one his attorneys, is a veteran of outdoor activities, having grown up as a "big outdoorsman" in Colorado (Deposition of Nicholas Parker ("Parker Dep") 37:21-24, excerpts attached as Exhibit J to Ruttinger Decl.). He often used insect repellents when "in the woods or in an environment where [he] thought it was likely that [he] would receive bug bites." (*Id.* 40:23-41:4.) Indeed, he used repellents because, in his experience, he was susceptible to mosquitoes and being bitten was a "common occurrence." (*Id.* 42:22-43:4.) Plaintiff frequently used Cutter-brand mosquito repellents while growing up in Colorado, although those products always contained DEET. (*Id.* 43:15-23.)

In 2015, Plaintiff decided to attend "a summer camp for adults, Camp No Counselors," in Upstate New York during Labor Day. (*Id.* 44:23-25.) The Camp No Counselors website describes the camp "on the northeastern tip of the Endless Mountains of Pennsylvania" set along the edge of a private lake.[6] Before attending Camp No Counselors, Plaintiff purchased mosquito repellent— a single pump bottle of Cutter Natural. (*Id.* 49:11-23.) He chose Cutter Natural knowing it was a

---

[6] *See* Camp No Counselors – New York, https://www.campnocounselors.com/locations/new-york/ (last visited April 9, 2019).

DEET-free product, even though growing up in Colorado it had been his practice to purchase DEET repellents because he "knew that DEET was effective at repelling insects." (*Id.* 48:14-23.) Plaintiff purchased Cutter Natural even though other products containing DEET were available because he assumed the "product would work just as well as" as Cutter's DEET products. (*Id.* 62:5-15.) Plaintiff assumed this even though Cutter Natural does not purport to repel mosquitoes as effectively as products containing DEET.

While at Camp No Counselors, Plaintiff applied Cutter Natural as directed but was still bitten by insects. He concedes he does not know what type of insect bit him, but he assumes the bites were from mosquitoes. (*See id.* 60:19-21.) As Dr. Donahue explains, however, Plaintiff's bites could have been the result of any number of biting insects because "[d]uring the summer months, inclusive of Labor Day, upstate New York is host to a number of biting insects, including ticks, and it is difficult, if not impossible, for laypersons to identify the source of their bites." (Donahue Decl. ¶ 39.) Nonetheless, Plaintiff bases his claims on his assumption that because he experienced unidentified insect bites, Cutter Natural "seemed pretty worthless to me." (Parker Dep. 94:14-15.)

It is impossible to know what bit Mr. Parker. But Plaintiff is an attractive host for mosquitoes (*Id.* at 42:22-43:4); received bites as a "common occurrence" even though he used DEET repellents "every time" he went out to participate in an outdoor activity (*id.* at 43:2-23), and was bitten by insects, which may or may not have been mosquitoes, while at a camp in upstate New York (*id.* at 60:19-21).[7] The variables in Plaintiff's experience with Cutter Natural underscore the uniqueness of each consumer's experience with Cutter Natural.

---

[7] Although Cutter Natural labels state the product "repels" mosquitoes, UIC never advertised the product as providing 100% protection against mosquito bites. A true and correct copy of the Cutter Natural label is attached as Exhibit K to the Ruttinger Declaration.

### III.     LAW AND ARGUMENT

#### A.       Class Certification Standards

Class action lawsuits are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Sykes v. Mel S. Harris and Associates, LLC*, 780 F.3d 70, 79 (2d Cir. 2015) (quoting *Dukes*, 564 U.S. 338). The "party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). This requirement is more than a "mere pleading standard"; "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Dukes*, 564 U.S. at 350.

Therefore, before this Court can certify a class, it must consider whether:

> (1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interest of the class.

Fed. R. Civ. P. 23(a). A plaintiff seeking to establish these prerequisites must demonstrate "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Rodriguez v. It's Just Lunch, Intern.*, 300 F.R.D. 125 (S.D.N.Y. 2014) (quoting *Dukes*, 564 U.S. 350); *see also* Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009).

In addition to the Rule 23(a) prerequisites, Plaintiff must also prove the putative class falls within one of the three types of class actions listed in Rule 23(b). Here, where the main thrust of Plaintiff's motion is for certification of a Rule 23(b)(3) class, the rule requires the district court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Additionally, the

class must be sufficiently cohesive to warrant adjudication on a classwide basis. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). This inquiry is "far more demanding" than the Rule 23(a)(2) commonality requirement. *Id.* at 624.

The Supreme Court has described Rule 23(b)(3) as an "adventuresome innovation" designed for cases "in which 'class-action treatment is not as clearly called for.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (quoting *Amchem*, 521 U.S. at 615). For that reason, in addition to the "rigorous analysis" courts must apply to Rule 23 class actions, *Dukes*, 564 U.S. at 350-51, the Supreme Court mandates that in the Rule 23(b)(3) context, lower courts take a "close look at whether common questions predominate over individual ones." *Comcast*, 569 U.S. at 35. This analysis may require the court to "probe behind the pleadings" and "may involve some overlap between the proof necessary for class certification and the proof required to establish the merits of the plaintiffs' underlying claims." *Id.* In short, "[m]erits questions may be considered to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen, Inc. v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455, 466 (2013).

**B.      Plaintiff cannot establish the Rule 23(a) prerequisites for class certification.**

In *Wal-Mart v. Dukes*, the Supreme Court confirmed that the "rigorous analysis" trial courts are required to perform when evaluating the Rule 23(a) factors may require a review of the merits. "Sometimes," the Supreme Court explained, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question" and "certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.' Frequently, that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Dukes*, 564 U.S. at 351 (citing

*General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982)).[8] "Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, *e.g.*, jurisdiction and venue, is a familiar feature of litigation." *Id.* at 352.

This is one such case that calls for the Court to probe beyond the pleadings. Plaintiff contends that because he was bitten by what he assumes were mosquitoes while using Cutter Natural, and the Biogents and i2L studies his counsel commissioned showed relatively poor repellency, Cutter Natural must be ineffective ("worthless") for *all* consumers in *all* environments *all* of the time. The factors that go into the effectiveness of a mosquito repellent for any given consumer under the circumstances of that consumer's use are far more complex than Plaintiff would have this Court assume.

### 1.    Plaintiff cannot establish that his claims are typical of the proposed class he seeks to represent.

The Rule 23(a) typicality prerequisite requires the party seeking certification to "show that 'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'" *In re Flag Telecom Holdings, Ltd. Securities Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). Plaintiff maintains the typicality requirement is "not demanding" (Doc. 49 at 15), relying on authority that pre-dates the Supreme Court's 2011 decision in *Dukes*. The Supreme Court in *Dukes*, however, clarified that the Court must apply a "rigorous analysis" to satisfy itself that the 23(a) requirements—including typicality—are met. *Dukes*, 564 U.S. at 350-51. Plaintiff's claims do not withstand such rigorous evaluation.

Plaintiff here seeks to satisfy the typicality requirement by characterizing his claims—and those of the class—as a straightforward false advertising case. In such cases, a manufacturer may

---

[8] By relying on two different experts to support his Motion for Class Certification, Plaintiff tacitly admits the Court must evaluate of the merits of his claims, including expert evidence, to determine whether the Rule 23 prerequisites for class certification are met.

be liable for advertising a product as having a characteristic that it demonstrably does not have for *any* class member. For example, a cooking oil is "100% Pure Olive Oil" or it is not. *See Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014). Truth or falsity in such cases does not depend on the experience of each consumer.

The record here shows that this is *not* an ordinary false advertising case. Plaintiff's premise is that Cutter Natural is "ineffective and worthless" for *all* consumers, but that assertion is contradicted by the consumer declarations submitted herewith and the paucity of consumers reporting dissatisfaction with Cutter Natural. (Schwallie Dep. 53:7-11.) The fact that Cutter Natural worked for some, if not most, members of the class he seeks to represent, proves the product was neither "ineffective" nor "worthless" as Plaintiff claims. It takes more than mere allegations that Plaintiff's and class members' injuries arose from common representations; Plaintiff must show "that the disputed issue[s] of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016) (internal quotation marks omitted).

The foregoing also demonstrates why Plaintiff's reliance on *Hart v. BHH*, No. 15cv4804, 2017 WL 2912519 (S.D.N.Y. July 7, 2017), is misplaced. In *Hart*, the Court considered whether to certify a class in which the central allegation was whether ultrasonic sound could—as a matter of science—repel pests in *any* circumstance. *See id.* at *1. By contrast, Plaintiff's claim is predicated on individualized instances in which, he claims, Cutter Natural has not worked: his personal use at a camp in New York; a small number of reports from dissatisfied consumers; and made-for-litigation testing in a tailored, controlled environment. Plaintiff has not produced any evidence—unlike in *Hart*—to substantiate his claim that Cutter Natural will not ever work for any consumer in any environment. Nor has he put forth evidence that the combination of active ingredients in Cutter Natural have zero propensity to repel mosquitoes in any circumstance.

17

Better comparisons than *Hart* are the many cases in which a court has determined that an individualized inquiry is needed to determine whether class members had a positive or negative experience with the product at issue. In *Pagan v. Abbott Laboratories*, 287 F.R.D. 139 (E.D.N.Y. 2012), for example, the court rejected a New York G.B.L. § 349 class, concluding that "individual inquiries will be required in order to determine . . . whether those who did purchase [the product] sustained any injuries" because many consumers got exactly what they set out to purchase. Likewise, in *Vaccariello v. XM Satellite Radio, Inc.*, 295 F.R.D. 62 (S.D.N.Y. 2013), a case involving the defendant's automatic renewal policy, the court denied certification of a § 349 class where individualized inquiries would be needed to separate out consumers who *wanted* their subscriptions to renew automatically. The same individualized inquiries apply to consumers who purchased Cutter Natural and found it effective.

> **2. Plaintiff cannot adequately represent a class seeking injunctive relief because he lacks standing to seek injunctive relief on his own behalf.**

Plaintiff lacks standing to seek injunctive relief under Federal Rule 23(b)(2). Standing to sue under Article III of the United States Constitution is a fundamental requirement of any lawsuit in federal court. The Supreme Court has set forth the "irreducible constitutional minimum" of standing as consisting of three elements: "The Plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). In the context of Rule 23(a), standing guarantees that the litigant has a "personal stake in the outcome." *O'Shea v. Littleton*, 414 U.S. 488, 493-94 (1974). Without that reassurance, conflicts of interest may arise between the class representative and other members of the class.

Plaintiff essentially confirms he lacks standing to seek injunctive relief. He testified that Cutter Natural "seemed pretty worthless to me." (Parker Dep. 94:14-15.) He has never indicated he would use the product again. Now that he has spoken with his longtime friend, roommate, and

now attorney, and has been told about allegedly deceptive representations by UIC, he is on notice that the product does not work for him and therefore will not suffer any future injury, even if he decides to purchase the product again. Under these circumstances, he lacks standing to pursue prospective, injunctive relief on behalf of the proposed class. *See Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) ("In order to meet the constitutional minimum of standing to seek injunctive relief, [Plaintiff] must carry the burden of establishing that 'he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged . . . conduct.'"); *Tomasino v. Estee Lauder Co., Inc.*, 44 F. Supp. 3d 251, 256 (E.D.N.Y. 2015) (plaintiff could not seek injunctive relief under GBL § 349 because she failed to allege a "sufficient future injury.").

### C. Plaintiff cannot satisfy the requirements of Rule 23(b)(3) because individual issues will predominate over issues common to the class.

#### 1. Individual issues will predominate on the question of whether Cutter Natural Insect Repellent is "effective" for members of the class.

Plaintiff must show that common questions of law or fact "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). This "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623-24. The predominance requirement is "far more demanding" than commonality under Rule 23(a) "and must be satisfied with evidentiary proof." *Id.*; *see also Comcast*, 569 U.S. at 33. Plaintiff cannot meet his obligation in this case; individual issues of fact make class certification improper.

The many variables that affect the efficacy of a personal mosquito repellent illustrate why individualized questions will always predominate over common ones. Certain individuals are more attractive to mosquitoes than others, and repellents perform differently based on a wide variety of user-specific, environment-specific, and mosquito-specific factors. (Donahue Decl. ¶¶ 17, 20, 21.) Two individuals may use the same repellent at the same time, under the same circumstance, and in the same environment, and experience different levels of efficacy. (*Id.* ¶ 21.) These

19

idiosyncrasies contribute to significant variability in laboratory testing as well and make it virtually impossible to judge mosquito repellent efficacy by "common evidence"; the question of efficacy is always driven by individuals' personal experiences. It is therefore unsurprising that Plaintiff's experience with Cutter Natural was drastically different from the experiences of the consumers whose Declarations UIC submits in support of this Opposition. Under these circumstances, certification under Rule 23(b)(3) is inappropriate because individualized questions of efficacy will necessitate individual-specific mini-trials before a court may resolve questions of mosquito repellent efficacy on a classwide basis. *See Pelman v. McDonald's Corp.*, 272 F.R.D. 82, 95 (S.D.N.Y. 2010) (finding class certification for plaintiffs' GBL § 349 claim improper, because "individual questions about causation would overwhelm" any common questions).

### 2.   Individual issues will predominate on the question of whether class members were deceived.

Consumers for whom Cutter Natural worked—*i.e.*, those who used the product and were not bitten by, or experienced fewer bites from, mosquitoes—were not "deceived" by the representation that Cutter Natural "repels mosquitoes." Determining whether that representation is false will require individualized proof about each consumer's experience. These individualized issues preclude certification under Rule 23(b)(3). *See Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 75-76 (S.D.N.Y. 2006) (collecting GBL § 349 cases where individualized issues such as proof of injury precluded certification); *Vaccariello*, 295 F.R.D. at 68 (holding that classwide injury could not be proven in a GBL § 349 case where "Plaintiff is unable to prove through common evidence which consumers in fact wanted their subscriptions to be automatically renewed.").

Further, Plaintiff's attempt to oversimplify this case by treating it like a straightforward false advertising case leaves him ill-situated to prove anything about a reasonable consumer's understanding of the Cutter Natural label. In Plaintiff's view, Cutter Natural either works or it does

not work; for him, there is no in-between. Such a dichotomy does not exist for most consumers. For example, depending on the setting, some consumers may decide that the product is only effective when applied every hour; others may be able to go several hours before needing to reapply to repel mosquitoes. Plaintiff's black-or-white approach also ignores the fact that, while Cutter Natural repels mosquitoes, UIC does not claim—for Cutter Natural or *any* product—that consumers who use the product will *never* be bitten by a mosquito.

There is no evidence, and certainly none proffered by Plaintiff, that reasonable consumers believe that by using Cutter Natural they will never be bitten by a mosquito, regardless of the environment in which it is used, how often it is applied, and other relevant factors. A reasonable consumer's understanding of the allegedly deceptive representations is a key component of determining whether a misrepresentation is fraudulent or "material," and thus actionable under New York G.B.L. § 349. *See Goldemberg v. Johnson & Johnson Consumer Co., Inc.*, 8 F. Supp. 3d 467, 478 (S.D.N.Y. 2014). Plaintiff's failure to advance any evidence on this point—much less *common* evidence—precludes certification.

### 3. Plaintiff cannot prove through common evidence that all class members received a "worthless" product.

Plaintiff leans on the Declaration submitted by Colin Weir to try and satisfy the Supreme Court's dictate "that a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury." *Waggoner*, 875 F.3d at 106 (citing *Comcast*, 569 U.S. at 35). Mr. Weir's proposed classwide damages models do not support Plaintiff's damages claim for two reasons.

First, as a threshold matter, Mr. Weir's proposal to resolve class damages via a "Full Refund" or "Unjust Enrichment" model fails for the reasons articulated above—Plaintiff cannot establish that Cutter Natural was "ineffective and worthless" on a classwide basis. Ordinarily, a plaintiff's failure to demonstrate that damages can be measured across the class does not alone

preclude class certification, but it is "a factor that [the Court] must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008), *abrogated on different grounds*, *Bridge v. Phoenix Bond & Indemn. Co.*, 553 U.S. 639 (2008).

Here, as Defendant's expert, Dr. Denise Martin, explains in her rebuttal report,  The fact that UIC received positive feedback from consumers, with only a statistically insignificant number of complaints, indicates that potential class members did not uniformly receive *no* value from Cutter Natural, and thus not all consumers are entitled to uniform full-refund damages. ▬▬▬▬ *see also* Schwallie Dep. 46:11-53:11.) The almost non-existent complaint rate also indicates that a full-refund model would grant most putative class members an unjustified windfall, since most of them never expressed dissatisfaction with their purchases of Cutter Natural. *In re POM Wonderful LLC*, No. ML 10-02199 DDP RZX, 2014 WL 1225184, at *3 (C.D. Cal. Mar. 25, 2014) (finding full-refund model insufficient under *Comcast* "because it fails to account for any value consumers received").

Mr. Weir's "back-up" damages models—such as his "Partial Efficacy" method—also fail to satisfy Plaintiff's burden. Under *Waggoner* and *Comcast*, a "plaintiff's damages model [must] track his theory of liability." *Waggoner*, 875 F.3d at 106. Yet, Mr. Weir's "Partial Efficacy" model would represent an about-face from the theory that Plaintiff has advanced all along—namely, that "Cutter Natural is a complete sham," "does not repel mosquitoes," and is "ineffective and

worthless." (Compl. ¶ 3.) As Mr. Weir admits, his back-up plan is designed to measure damages in the event that ███████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████ This "even if I lose, I win" model disconnects Mr. Weir's damages model from Plaintiff's theory of the case in conflict with *Waggoner* and *Comcast*.

### D.    Certification of a Rule 23(b)(2) injunctive relief class is inappropriate in light of Plaintiff's lack of standing to pursue injunctive relief individually.

Plaintiff cannot show that certifying an injunctive-relief class is appropriate under Rule 23(b)(2). As addressed *supra* on pages 18-19, Plaintiff lacks standing to represent an injunctive relief class because his conclusion that Cutter Natural is "worthless to me" (Parker Dep. 94:14-15) confirms he will not be injured in the future. If he purchases Cutter Natural again, it would be with full knowledge that the product, in his view, does not repel mosquitoes. *See Vaccariello*, 295 F.R.D. at 68 (denying certification of a Rule 23(b)(2) class for injunctive relief because "[a] class cannot be certified if a named plaintiff lacks Article III standing" and a "[p]laintiff cannot satisfy the injury-in-fact requirement in actions for injunctive relief by relying on past injuries.").

Beyond Plaintiff's lack of standing, there is no support legally or factually for the specific injunctive relief he requests—"an order enjoining Defendant from continuing [its] illegal practices . . . and compelling Defendant to undertake a corrective advertising campaign." (Compl. ¶ 53(g).) The record establishes that UIC lawfully sold Cutter Natural and the product *does* repel mosquitoes. Thus, there is no basis for the corrective advertising campaign Plaintiff seeks.

### E.    If this Court certifies a class, it should be restricted to consumers who purchased Cutter Natural Insect Repellent in the State of New York.

If this Court determines class certification is appropriate, then it should limit the class to consumers who purchased Cutter Natural in the State of New York. *Bristol-Myers Squibb Co. v. Superior Court of California* requires such narrow tailoring, having clarified that non-resident

plaintiffs cannot pursue claims in a forum in which they cannot establish specific jurisdiction, even if there are in-state plaintiffs with factually similar claims. In *Bristol-Myers*, the Supreme Court held that personal jurisdiction is claim- and claimant-specific, such that there "must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation," and when there "is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." 137 S. Ct. at 1780-81.

The Supreme Court's reasoning applies with equal force to the class-action context and, consequently, it is not enough for Plaintiff to establish specific jurisdiction for his own claim in New York. To justify a multi-state class under *Bristol-Myers*, he must establish that this Court can constitutionally adjudicate the claims of out-of-state plaintiffs with no connection to New York. Notably, New York federal courts spearheaded the now-national trend of recognizing that *Bristol-Myers* applies to putative classes, limiting their geographic scope. In *In re Dental Supplies Antitrust Litig.*, No. 16-cv-696, 2017 WL 4217115, at *9 (E.D.N.Y. Sept. 20, 2017), the Eastern District of New York rejected "attempt[s] to side-step the due process holdings in *Bristol-Myers* by arguing that the case has no effect on the law in class actions.":

> The constitutional requirements of due process do[] not wax and wane when the complaint is individual or on behalf of a class. Personal jurisdiction in class actions must comport with due process just the same as any other case. *See, e.g.*, *King Cty. v. IKB Deutsche Industriebank AG*, 769 F. Supp. 2d 309, 315 (S.D.N.Y. 2011) (dismissing class action against individual defendants for lack of jurisdiction because defendants' conduct lacked an articulable nexus to the plaintiffs' claims).

*Id*. Numerous courts have followed this lead. *See, e.g.*, *Jackson v. Bank of America, N.A.*, No. 16-CV-787G, 2018 WL 2381888, *5 n. 2 (W.D.N.Y. May 25, 2018) (rejecting attempt to distinguish *Bristol-Myers Squibb* as applying only to jurisdiction of state courts); *Wenokur v. AXA Equitable Life Ins. Co.*, No. CV-17-00165-PHX-DLR, 2017 WL 4357916, at *4 n.4 (D. Ariz. Oct. 2, 2017) (noting that court "lacks personal jurisdiction over the claims of putative class members with no

24

connection to Arizona, and therefore would not be able to certify a nationwide class"); *McDonnell v. Nature's Way Prods., LLC*, No. 16 C 5011, 2017 WL 4864910, at *4 (N.D. Ill. Oct. 26, 2017) (in-state plaintiff's connection with forum "cannot provide a basis for the Court to exercise personal jurisdiction over the claims of nonresidents").

Finally, the fact that Plaintiff's nationwide and multi-state classes will require this Court to apply the laws of all fifty states in and of itself precludes certification under Rule 23(b)(3). Certification is improper if "conflicts in governing law will overwhelm the ability of the trier of fact meaningfully to advance the litigation through classwide proof." *Johnson v. Nextel Communications Inc.*, 780 F.3d 128, 140-41 (2d Cir. 2015). States' consumer protection laws, including fraud and breach-of-warranty, differ with respect to the required elements to state a cause of action, including reliance, scienter, ascertainable loss, and notice. *See In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 147 n.8 (S.D.N.Y. 2008). These variables, alone, demonstrate why Plaintiff's putative class should be—at best—limited to New York consumers of Cutter Natural. *See also McLaughlin*, 522 F.3d at 222-25 (decertifying a nationwide class of "light" cigarette smokers because their claims required a showing of individualized reliance).

## IV.   <u>CONCLUSION</u>

Plaintiff has sought to construct a nationwide class action out of his personal belief that Cutter Natural "ineffective" and "worthless," yet the record establishes that questions about mosquito repellent efficacy are not susceptible to such absolutes. For the reasons set forth above, and in the material accompanying this Opposition, UIC submits that Plaintiff's claims are not suitable for classwide resolution and respectfully requests that the Court deny Plaintiff's Motion for Class Certification. Alternatively, to the extent this Court agrees to certify a class, it should be restricted to a narrow class of consumers who purchased Cutter Natural in the State of New York

.

Dated: April 15, 2019

_/s/ Ronie M. Schmelz_

Ronie M. Schmelz
TUCKER ELLIS LLP
515 South Flower Street
Forty Second Floor
Los Angeles, CA 90071
Tel.:  213.430.3400
Fax:  213.430.3409
E-mail:       ronie.schmelz@tuckerellis.com

Michael J. Ruttinger (pro hac vice)
TUCKER ELLIS LLP
950 Main Avenue
Suite 1100
Cleveland, OH 44113-7213
Tel:  216.592.5000
Fax: 216.592.5009
E-mail:       michael.ruttinger@tuckerellis.com

*Attorneys   for   Defendant   United   Industries
Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2019, a copy of the foregoing Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Dated: April 15, 2019

*/s/ Ronie M. Schmelz*
Ronie M. Schmelz
TUCKER ELLIS LLP
515 South Flower Street
Forty Second Floor
Los Angeles, CA 90071
Tel.:  213.430.3400
Fax:  213.430.3409
E-mail:      ronie.schmelz@tuckerellis.com

Michael J. Ruttinger (pro hac vice)
TUCKER ELLIS LLP
950 Main Avenue
Suite 1100
Cleveland, OH 44113-7213
Tel:  216.592.5000
Fax: 216.592.5009
E-mail:      michael.ruttinger@tuckerellis.com

*Attorneys for Defendant United Industries Corporation*

4186139.1